UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

| TRACY LAWLOR, | : |  |
|---|---|---|
| Plaintiff, | : |  |
| v. | : | File No. 1:16-cv-30-jgm |
| NANCY A. BERRYHILL,<br>Acting Commissioner of Social Security, | : |  |
| Defendant. | : |  |

MEMORANDUM AND ORDER
(Docs. 10, 13)

I.  Introduction

Plaintiff Tracy Lawlor (Lawlor) brings this action under 42 U.S.C. § 405(g) of the Social Security Act, requesting review and reversal of the Commissioner of Social Security's (Commissioner) denial of her application for disability insurance benefits.  Pending before the Court are Lawlor's motion seeking an order reversing the Commissioner's decision (Doc. 10 (Doc. 10-1 Memorandum)), and the Commissioner's motion seeking an order affirming her decision (Doc. 13). Lawlor filed a reply.  (Doc. 16.)  For the reasons set forth below, Lawlor's motion to reverse is granted and the Commissioner's motion to affirm is denied.

II.  Background

A.  Procedural

On June 13, 2012, Lawlor filed an application for disability insurance benefits alleging she became disabled as of January 1, 2008.  (A.R. 149-55.)  On November 1, 2012, her application was denied, id. at 87-89, and, on March 22, 2013, was denied again on reconsideration, id. at 99-101. Lawlor filed a timely request for an administrative hearing, id. at 103-04, which was held by

Administrative Law Judge ("ALJ") Thomas Merrill on April 14, 2014, id. at 27-56.  Lawlor appeared with a representative at the hearing and testified.  Id.  On July 14, 2014, the ALJ issued a decision concluding Lawlor was not disabled from the alleged disability onset date of January 1, 2008, through the date of the decision.  Id. at 11-21.  The Appeals Council denied her timely request for review on December 8, 2015, and the ALJ's decision became the final decision of the Commissioner.  Id. at 1-3.

In February 2016, Lawlor timely filed this action.  (Docs. 1-3.)  She raises four challenges to the ALJ's decision:  (1) the ALJ failed to properly consider her fatigue; (2) he failed to make findings regarding the effects of her medications and treatment on her functional abilities; (3) the ALJ erred in his determination of her residual functional capacity ("RFC"); and (4) he erred in evaluating the medical opinions of Dr. Tietz, her treating psychiatrist.  (Doc. 10-1.)

B.  Medical History

Lawlor was born July 23, 1968.  (A.R. 149.)  She has a high school education (GED), an LNA, and some college.  Her past relevant work is as a warehouse worker and LNA.  Id. at 31-32.  She worked part-time as an LNA from 2008 until June 2012.  Id. at 36.  In November 2011, Lawlor was diagnosed with hepatitis C.[1]  Id. at 37.  She alleges disability as a result of anxiety and her hepatitis treatment.  Id. at 32-33, 37-40.

1.  Psychiatric Treatment

Since at least 1998, Lawlor has treated with psychiatrist Judith Tietz, M.D.  (A.R. 917.)  In February 2000, Lawlor asked Dr. Tietz to hospitalize her.  Dr. Tietz assessed major depressive episode, severe, recurrent, without psychotic features, attention deficit disorder, and generalized

---

[1] The factors for her hepatitis C were tattoos placed in 1987 and 1988.  She also has a history of very heavy alcohol use from age 14-30.  (A.R. 404.)

2

anxiety disorder.  She noted Lawlor's current medications of Ritalin and Klonopin, her prior trials of Prozac, Paxil, Zoloft, Effexor, and Serzone, and prescribed Wellbutrin.  Id. at 894.

In April 2005, Dr. Tietz noted Lawlor had begun working at Maplewood Nursing Home.  In July, Lawlor reported she had felt overwhelmed but was doing better and Dr. Tietz provided counseling regarding vocational issues.  (A.R. 857-58.)  In August, her Ritalin prescription was increased from 5mg to 10mg.  Id. at 856-57.  In October 2006, Lawlor reported she was doing well but her anxiety was "so bad."  Id. at 851.  In April 2008, Lawlor reported her panic was at a low level but had been high three weeks prior, she was not depressed, and restarted taking Ritalin she had discontinued while pregnant.  Id. at 848.

In April 2009, Dr. Tietz noted Lawlor was generally doing well, anxiety was even, and she was working per diem.  She thought Lawlor's generalized anxiety disorder ("GAD") could benefit from a low dose of clonazepam.  (A.R. 847.)  In February 2010, Lawlor reported she was sober. Id. at 846.

In January 2011, Dr. Tietz noted she was less anxious though she had an episode of panic, felt fatigued on clonazepam so the dose was lowered, and was prescrbed Xanax.  (A.R. 845.)  On March 17, Lawlor was very anxious, overwhelmed, and tearful.  She had taken more of her clonazepam and ran out early, so Dr. Tietz doubled her Xanax.  Dr Tietz's mental status exam noted she was very tearful, upset, agitated, but goal-directed and no evidence of psychosis.  She assessed her GAD as "quite severe at this time, as she has pulled the rug out from under herself by stopping the Klonopin."  She directed Lawlor to restart Klonopin.  Id. at 843.  By March 31, she was feeling better, restarted clonazepam so was less anxious, and continued on Xanax and Ritalin.  In May, her anxiety was up.  Id. at 843.  In July, she called Dr. Tietz reporting she was panicky and had run out of Klonopin because she was taking too much.  Id. at 842.  In September, she reported she felt

overwhelmed at times but was not depressed and had social anxiety. Lawlor cancelled her December appointment. Id. at 381.

In January 2012, Dr. Tietz noted Lawlor had discontinued taking clonazepam and had been diagnosed with hepatitis C. Her mood was good and GAD stable. (A.R. 381.) In July, Lawlor reported she was very anxious, fearful, and could not leave the house. Dr. Tietz assessed GAD with panic disorder and agoraphobia. Id. at 380. In August, she was anxiously anticipating very bad side effects from her hepatitis treatment and would stay on lorazepam which was working well. Id. at 502. In October, Lawlor reported she was responding to her treatment, was moody but denied feeling depressed, and had increased her lorazepam dose to 8mg per day. Dr. Tietz discussed the risk of this behavior and the importance of using another agent to lower her anxiety. She assessed the irritability may be a mood disorder and instructed she limit her lorazepam to 4mg per day. Id. at 501. In November, Lawlor reported using more lorazepam than prescribed and running out. Id. In December, she denied depression but was very anxious and in excruciating pain. She had lowered interest and was fearful and overwhelmed. Dr. Tietz assessed GAD worsened by hepatitis treatment and mood disorder. Id. at 500.

In March 2013, Dr. Tietz and Lawlor spoke by phone. Lawlor reported she was not sleeping, was extremely anxious, and felt overwhelmed. The plan was to consider Seroquel. (A.R. 809.) In May, Lawlor reported her anxiety was "sky high," Seroquel knocks her out but makes it hard to breathe, she had a short fuse and was agitated. Dr. Tietz noted she had fair judgment and insight, was oriented with intact memory and focused attention and concentration, low mood and unstable, tearful affect. She diagnosed mood disorder, GAD and panic, and noted her anxiety was worsened by hepatitis treatment. Id. at 804-05. In September, Lawlor reported she continued to struggle with sadness and grief following her father's death, her anxiety was high, she did not like to

4

leave the house, and her husband did most of the shopping because of her panic attacks. Dr. Tietz noted psychomotor agitation, fair judgment and insight, was oriented with intact memory and focused attention and concentration, low mood and anxious affect, and was overusing lorazepam and clonazepam. Dr. Tietz added Valium to her prescriptions. Id. at 802-03. In December, Lawlor reported her anxiety had been very high, she used marijuana to lower her anxiety but then does not get out, rarely leaves the house, and was sleeping all day. Dr. Tietz noted she had good judgment and insight, was oriented with intact memory and focused attention and concentration, unstable mood. She diagnosed GAD, ADD, and cannibus abuse, recommended considering medical marijuana, and noted current medications were Valium and Seroquel. Id. at 800-01.

On February 13, 2014, Dr. Tietz noted Lawlor continued to deal with panic and agoraphobia, rarely leaving the house except for appointments, does not attend to activities of daily living, and spends most of the day in bed. She reported she was easily overwhelmed by people and activity. (A.R. 840.) Dr Tietz noted obesity and hepatitis C, fair judgment and insight, oriented, intact memory, scattered attention and concentration, low mood and tearful affect. She assessed ADD, panic disorder, agoraphobia. Her current medications were Valium, Seroquel and Ritalin. Dr. Tietz noted her lifelong anxiety and panic and that she was very limited in her ability to leave the home. Id. at 840-41. On March 10, 2014, Lawlor reported her anxiety was "sky high." She does not walk her children to the bus, her husband does all the grocery shopping, and she spends much of her day in bed. Dr. Tietz noted fair judgment and insight, oriented, intact memory, easily distracted attention and concentration, low mood and anxious. Her diagnoses remained the same but Seroquel was discontinued and Lexapro added. (A.R. 838-39.)

5

2. <u>Hepatitis Treatment</u>

Lawlor was diagnosed with hepatitis C while undergoing evaluation for gastric bypass surgery. On June 29, 2012, Lawlor saw Nurse Practitioner Kristen Ray to review the results of her June 12 liver biopsy. (A.R. 401-12.) Her portal/periportal inflammation was grade 3/4, lobular inflammation was grade 2/4, fibrosis was stage 3-4/4, and mild macrovesicular steatosis, focal pericellular fibrosis and occasional ballooned hepatocytes were present, consistent with steatohepatitis. Id. at 401. NP Ray noted she was anxious and agitated with an angry affect, assessed hepatitis C with bridging fibrosis moving toward cirrhosis and NASH, a metabolic syndrome, and recommended triple therapy with peg interferon, ribavirin and protease inhibitor as well as weight loss. Id. at 402.

On August 27, 2012, NP Ray discussed the typical side effects of the hepatitis treatment with Lawlor. Physical side effects can consist of flu-like symptoms, including fever, chills and arthralgias, nausea, vomiting, diarrhea and weight loss, hair thinning, rash, and visual changes. Psychiatric side effects can include difficulty concentrating, irritability, depression, and suicidal or homicidal thoughts. Side effects of Telaprevir are severe rash and anal discomfort. NP Ray stressed the importance of strict adherence to the medication regimen and informed Lawlor she would require weekly lab tests. (A.R. 638.)

She began HCV treatment on September 14, 2012. In October, NP Ray assessed hepatitis C, anemia, rectal burning, and hemorrhoids. Her Ribavirin was reduced. (A.R. 393-95.) In November, her anemia was stable on the lower dose of Ribavirin but her potassium level was low. Id. at 389-91. In December, Lawlor had a fever and fatigue, blurry vision, and was nervous and anxious. Her rectal burning had improved since finishing Telaprevir, her irritability and anxiety were

worse on the interferon, she could restart Klonopin since the Telaprevir therapy was complete, and she was frustrated her weight loss had plateaued. Id. 384-87.

In May 2013, Lawlor was very calm during her visit with NP Ray but reported her anxiety had been worsening and, while making a medication switch with her psychiatrist in mid-April, had an episode where she was angry and threw a chair. NP Ray noted her irritability and anxiety were ongoing issues and they discussed the possibility of ending her hepatitis treatment early. (A.R. 797-98.) In June, her medication was switched to Risperdal which she used to help her sleep; the Seraquel made her feel like a "drooling idiot." She hoped to continue on the HCV treatment. Id. at 794-95. In August, she had completed 46 of 48 weeks of treatment when she stopped it following her father's death. NP Ray noted if her viral load remains negative at six months, treatment would be considered a cure of the hepatitis, her anemia was expected to improve, she had lost weight while on interferon and needed to continue to help with the steatosis in her liver. Id. at 789-90.

On February 20, 2014, Lawlor saw NP Ray and her viral load was negative indicating a cure of her hepatitis C. NP Ray noted she was nervous and anxious but alert and oriented. (A.R. 834-35.)

    C.    <u>General Medical</u>

On September 27, 2011, she reported to the emergency room for cough and fatigue. She was assessed with bronchitis, hypertension, obesity and tobacco use and prescribed azithromycin, albuterol and prednisone. (A.R. 429.) She followed up with Family Nurse Practitioner Louise McDevitt on October 3, who noted she prescribed Lawlor hypertension medication in 2008 but she never filled it. Lawlor was interested in gastric bypass and Lap-Band surgery but upset the surgical programs take a year before the procedure occurs. Id. at 428. On November 3, NP McDevitt noted two weeks after starting medication, her blood pressure had gone from 195/105 to 140/102.

Id. at 427. On January 16, 2012, NP McDevitt noted Lawlor had not attempted lifestyle or dietary changes. The elevated liver function tests originally thought to be fatty liver due to obesity was hepatitis C, her hypertension was under much better control, she would begin hepatitis treatment with monitoring for depressive symptoms, and type 2 diabetes treatment needed to be seriously considered. Id. at 426.

On October 23, 2012, Lawlor reported to the emergency room with a fever, chills, shortness of breath, cough, vomiting, dizziness, and blurred vision. It was noted chronic symptoms from her hepatitis treatment are shortness of breath, nausea, vomiting, and cough. (A.R. 605-08.)

On July 7, 2013, Lawlor reported to the emergency department with abdominal pain and was diagnosed with acute appendicitis. The CT scan also revealed bilateral spondylolysis at L5 with degenerative disc disease at L5-S1. (A.R. 813-20.) She underwent successful laparoscopic appendectomy surgery. Id. at 786-87, 779.

On January 20, 2014, NP Ray noted during the last two weeks of her hepatitis treatment, Lawlor became psychotic, combative and paranoid. She had started drinking alcohol--after abstaining for 11 years--following the death of her father but had almost stopped drinking and was using marijuana, which she felt was the only thing helping her anxiety. Medical marijuana was discussed and the need to stop drinking alcohol in light of her Valium medication. (A.R. 810-11.)

On February 12, Lawlor saw Dr. Timothy Shafer to discuss possible marijuana registry for THC treatment of chronic anxiety. She reported since her January appointment with NP McDevitt, she had stopped drinking. She had a long history of anxiety and depression with current feelings of great apprehension and panic, especially when contemplating public situations such as shopping. When she attempts it, she gets frightened, angry or otherwise inappropriate. Dr. Shafer expressed reluctance to prescribe marijuana based on her description of her response to marijuana--completely

8

exhausted and basically non-functional though without anxiety--and wanted to talk to Dr. Tietz regarding a treatment plan consensus. (A.R. 829-33.)

  D.  Medical Opinions

On September 22, 2012, Dr. Charles Gluck performed a physical consultative examination. (One week after she started Hep C treatment). On exam, he noted she was anxious and depressed, moderately obese, and tender at L3 to S1 and left and right patella. Dr. Gluck diagnosed joint pain in the knees, degenerative disc disease at L5-S1, hepatitis C, and anxiety. He assessed she had no limitations on standing, walking, or sitting capacity, maximum lifting capacity was 50 pounds occasionally and 25 pounds frequently, and no limitations in postural, manipulative or environmental activities. (A.R. 503-07.)

On October 24, 2012, Sandra Campbell, Psy.D., performed a psychological consultative exam. On exam, she noted Lawlor was anxious and timid, with fatigued demeanor, oriented, with average to low average estimated IQ, no behavioral concerns or evidence of communication difficulty. She noted her current level of functioning included three baths per day to soak her rectum because of the anal pain side effect of her hepatitis treatment. She diagnosed generalized anxiety disorder, hepatitis C, [Axis IV severe] and a GAF of 52. She opined Lawlor's condition was likely to remain much the same for a twelve-month period. (A.R. 540-44.) Dr. Campbell assessed her functional capacity as capable of understanding simple oral instructions under ordinary supervision, but "at the present time her level of anxiety as well as her fatigue, would make it difficult for her to adapt to the average work situation." Id. at 543.

On October 30, 2012, state agency consultant Dr. Edward Schwartzreich opined Lawlor had impairments of primary severe anxiety disorder, secondary severe other and unspecified arthropathies, severe spine disorders, severe other disorders of gastrointestinal system, and non-

9

severe hypertension. He further opined she had moderate restriction of activities of daily living, moderate difficulties in maintaining social functioning, mild difficulties in maintaining concentration, persistence or pace, and no episodes of decompensation. He noted there was insufficient evidence to rate the period prior to November 1, 2011. (A.R. 63-64.) Dr. Schwartzreich opined Lawlor's mental RFC for November 1, 2011 through October 30, 2012, included no limitations in understanding and memory, moderately limited ability to maintain attention and concentration for extended periods, moderately limited ability to work in coordination with or in proximity to others without being distracted, and moderately limited ability to complete a normal workday and workweek without interruptions from psychological based symptoms and to perform at a consistent pace without an unreasonably number and length of rest periods. Specifically, "[d]ue to chronic mixed anxiety, [Lawlor] will have problems working with unfamiliar personnel, and at times of increased anxiety she may need to take additional times out or require more supervision in order to sustain concentration." She otherwise retains the ability for 1-3 step tasks for 2 hours over an 8-hour workday in a 40-hour workweek. Id. at 67. Lawlor's ability to interact appropriately with the general public was markedly limited and ability to accept instructions and respond appropriately to criticism from supervisors was moderately limited; she should not be expected to work with the general public. Id. at 67-68.

On November 1, 2012, SDM Maxwell Criden opined Lawlor retained the physical RFC to occasionally lift and/or carry twenty pounds, frequently lift and/or carry ten pounds, stand, walk and sit for 6 hours in an 8-hour workday with 3-5 minutes of positional change per hour spent standing or walking, frequently climb ramps, stairs, ladders, ropes, and scaffolds, and frequently kneel and crouch with no manipulative, visual, communicative, or environmental limitations. (A.R. 65-66.)

10

On March 15, 2013, Dr. Geoffrey Knisely opined Lawlor retained a physical RFC identical to Criden's except it included the period until March 15. (A.R. 81-82.)

On March 22, 2013, state agency consultant Edward Hurley, Ph.D., opined Lawlor had impairments of primary severe anxiety disorder, secondary severe chronic liver disease, and severe other and unspecified arthropathies, spine disorders, and other disorder of the gastrointestinal system. She had moderate restriction of activities of daily living, moderate difficulties in maintaining social functioning, mild difficulties in maintaining concentration, persistence or pace, and no episodes of decompensation. He noted there was insufficient evidence to rate the period prior to November 1, 2011. (A.R. 79-80.) His mental RFC assessment was identical to Dr. Schwartzreich's except it included the period until March 22, 2013. Id. at 82-84.

On March 13, 2014, Dr. Tietz completed a medical source statement of ability to do work-related activities (mental). (A.R. 823-28.) She opined Lawlor had a generalized anxiety disorder accompanied by motor tension, autonomic hyperactivity, apprehensive speculation, and vigilance and scanning and had persistent irrational fear of a specific object, activity, or situation resulting in compelling desire to avoid it and recurrent severe panic attacks manifested by a sudden unpredictable onset on average once a week except when she avoided leaving the house. She also opined Lawlor had depressive syndrome characterized by anhedonia or pervasive loss of interest in almost all activities, appetite disturbance with change in weight, sleep disturbance of excessive sleeping, psychomotor agitation or retardation, and feelings of guilt or worthlessness. She opined Lawlor had extreme restrictions in activities of daily living, extreme difficulties maintaining social functioning, extreme difficulties in maintaining concentration, persistence or pace, and difficulty completing tasks in a timely fashion. She had experienced four or more episodes of decompensation. Her mental illness was characterized by adverse responses to trivial circumstances

11

that would occur in the workplace, she would cease to function effectively when receiving criticism from supervisors or conflicts with co-workers, she would have difficulty responding appropriately to coworkers, supervisors and the general public. She would not be able to make it to the work setting and becomes easily and clearly upset, needs to pace around, may become tearful, experiences tunnel vision, and is unable to focus, concentrate or hear what is going on around her. She would not be able to focus and concentrate for 2 hour periods during an 8-hour workday, would be absent because she would likely be unable to make it to the work setting. Also, her prescribed medication of Seroquel would cause fatigue and fogginess.

      E.      <u>Hearing Testimony</u>

At the hearing, a vocational expert testified that someone with limitations consistent with Lawlor's limitations as determined in the RFC would be unable to perform Lawlor's past relevant work but could perform the jobs of cleaner and price marker--jobs that existed in significant numbers nationally and regionally. (A.R. 48-50.)

III.      <u>Standard of Review</u>

The Social Security Act defines the term "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). A person will be found to be disabled only if it is determined that his "impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." <u>Id.</u> § 423(d)(2)(A).

The Commissioner uses a five-step sequential process to evaluate disability claims. Butts v. Barnhart, 388 F.3d 377, 380-81 (2d Cir. 2004). At the first step, the ALJ determines whether the claimant is presently engaging in "substantial gainful activity." 20 C.F.R. §§ 404.1520(b), 416.920(b). If the claimant is not, the ALJ determines whether the claimant has a "severe impairment." Id. §§ 404.1520(c), 416.920(c). If the ALJ finds the claimant has a severe impairment, the third step requires the ALJ to determine whether the claimant's impairment meets or equals an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. Id. §§ 404.1520(d), 416.920(d). A claimant is presumptively disabled if the impairment meets or equals a listed impairment. Ferraris v. Heckler, 728 F.2d 582, 584 (2d Cir. 1984).

If the claimant is not presumptively disabled, the fourth step requires the ALJ to consider whether the claimant's RFC precludes the performance of his or her past relevant work. 20 C.F.R. §§ 404.1520(f), 416.920(f). The fifth and final step requires the ALJ to determine whether the claimant can do "any other work." Id. §§ 404.1520(g), 416.920(g). The claimant bears the burden of proving his or her case at steps one through four, Butts, 388 F.2d at 383, and at step five, there is a "limited burden shift to the Commissioner" to "show that there is work in the national economy that the claimant can do," Poupore v. Astrue, 566 F.3d 303, 306 (2d Cir. 2009).

In reviewing the Commissioner's disability decision, the court limits its inquiry to a "plenary review of the administrative record to determine if there is substantial evidence, considering the record as a whole, to support the Commissioner's decision and if the correct legal standards have been applied." Moran v. Astrue, 569 F.3d 108, 112 (2d Cir. 2009). A court's factual review of the Commissioner's decision is limited to determining whether "substantial evidence" exists in the record to support such a decision. 42 U.S.C. § 405(g). "Substantial evidence" is more than a mere scintilla; it means such relevant evidence as a reasonable mind might accept as adequate to support a

13

conclusion.  Richardson v. Perales, 402 U.S. 389, 401 (1971); Poupore, 566 F.3d at 305 (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)).  The Commissioner, as the trier of fact, resolves evidentiary conflicts and assesses credibility.  See Richardson, 402 U.S. at 399.  Under this "very deferential standard of review," once an ALJ has found facts, a court can reject those facts "only if a reasonable factfinder would have to conclude otherwise."  Brault v. Commissioner, 683 F.3d 443, 448 (2d Cir. 2012) (internal quotation marks and citation omitted); 42 U.S.C. § 405(a) (on judicial review, "[t]he findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive").

IV.  Discussion

Lawlor asserts the ALJ erred in considering her fatigue and the effects of her medications and treatment on her functional abilities, in his determination of her RFC, and in evaluating the medical opinions of her treating psychiatrist.  (Doc. 10-1.)  The Commissioner contends that substantial evidence supports the ALJ's determinations and credibility assessment.  (Doc. 13.)

The ALJ found Lawlor met the insured status requirements through December 31, 2016, had not engaged in substantial gainful activity since January 1, 2008, the alleged onset date, and had severe impairments of chronic liver disease secondary to hepatitis C, degenerative disc disease, obesity, chondromalacia patella of the knees, anxiety disorder, and a history of alcohol abuse in remission.  (A.R. 13-14.)  He noted he also considered Lawlor's "various psychiatric diagnoses," hypertension and attention deficit hyperactivity disorder but found those conditions to be nonsevere.  Id.  The ALJ found Lawlor did not have an impairment or combination of impairments that met or equaled a listed impairment.  Id. at 14-17.  The ALJ determined Lawlor retained the residual functional capacity to perform:

> light work . . ., meaning she can lift 20 lbs. occasionally and 10 lbs. frequently, stand or walk for 6 hours in an 8-hour workday, and sit for 6 hours in an 8-hour workday.

14

> She has unlimited use of her hands and feet to operate controls, and push and pull, she is unlimited with respect to balancing, stooping and crawling but she is limited to frequent climbing, kneeling and crouching. The claimant is limited to the performance of unskilled work, meaning she can retain concentration, persistence and pace for 1-3 step tasks for 2-hour periods throughout a typical 8-hour workday and 40-hour workweek. She is capable of engaging in routine interactions with supervisors and co-workers but should not be expected to work with the general public.

Id. at 17. While the ALJ determined Lawlor was unable to perform her past relevant work, considering her age, education, work experience, and RFC, he found she is capable of making a successful adjustment to other jobs existing in significant numbers in the national economy. Id. at 20-21. Accordingly, he found she was not disabled under the Social Security Act from January 1, 2008, through the date of the decision. Id. at 21.

Lawlor argues the ALJ erred by failing to consider her fatigue, which significantly worsened after she began hepatitis treatment in September 2012, and to make findings regarding the side effects of her medications, specifically the effects of her hepatitis treatment on her functional abilities. (Doc. 10-1 at 7-13.) An ALJ has an obligation to consider the effect of medications. 20 C.F.R. § 404.1529(c)(3)(iv) (evaluating symptoms, "[t]he type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate [] pain or other symptoms" must be considered). The ALJ's decision does not refer to Lawlor's almost year-long course of treatment for hepatitis C or to the lengthy list of medications she was prescribed for her anxiety disorder throughout the period of alleged disability. See A.R. 11-21. The record demonstrates Lawlor was experiencing significant side effects from her medications, particularly the hepatitis course of treatment that lasted almost one year. The ALJ relied on Dr. Knisely's opinion when evaluating Lawlor's chronic liver disease, id. at 15, though that opinion was rendered prior to the end of her hepatitis treatment and was identical to SDM Criden's opinion rendered just weeks after she began

15

the treatment. The record before the ALJ included additional medical records detailing Lawlor's treatment history for her severe impairment of chronic liver disease secondary to hepatitis C.

The ALJ further erred because he failed to account for any limitations caused by the effects of Lawlor's medications and treatment in her RFC. The ALJ relied on the state agency consultants' opinions rendered in late 2012 and early 2013. As noted, this was near the beginning of her hepatitis treatment. Further, the ALJ mentions the opinion of Dr. Campbell, a consultative examiner, only in the context of contradicting Dr. Tietz's opinion. (A.R. 19.) He fails to acknowledge Dr. Campbell's assigned GAF of 52 or assessment of Lawlor's functioning, including her opinion that Lawlor's "level of anxiety as well as her fatigue, would make it difficult for her to adapt to the average work situation." Id. at 19, 543. The Court cannot conclude the ALJ fully considered the entirety of the record before him when formulating Lawlor's RFC and therefore cannot conclude it is supported by substantial evidence.

Lastly, Lawlor argues the ALJ erred in assessing her treating psychiatrist Dr. Tietz's opinions. (Doc. 10-1 at 23.) He gave her opinions "little weight" because they were "so drastically divergent" from the opinions of the state agency consultants. (A.R. at 19.) The Court notes Dr. Tietz's medical source statement was completed in March 2014, while the identical opinions of the state agency consultants rendered in October 2012 and March 2013, did not have the benefit of Lawlor's most recent records detailing an increase in her symptoms while undergoing hepatitis treatment and the onset of her agoraphobia. See Tarsia v. Astrue, 418 F. App'x 16, 18 (2d Cir. 2011) (holding where it was unclear whether an agency consultant reviewed all relevant medical information, the consultant's opinion is not supported by evidence of record, as required to override the opinion of a treating physician). On remand, the ALJ should reevaluate the weight to give Dr. Tietz's opinions under the treating physician rule, particularly in light of the long treatment relationship, regularity of

examination, and additional medical records added after the state agency consultants' opinions were rendered. The Court notes an updated opinion from a state agency consultant after review of the full record could be beneficial.

V. Conclusion

The ALJ committed legal error because he failed to consider the effects of Lawlor's medications, specifically her hepatitis treatment, on her functional abilities. Lawlor's motion for an order reversing the decision of the Commissioner (Doc. 10) is GRANTED. The Commissioner's motion seeking an order affirming her decision (Doc. 13) is DENIED. The matter is remanded for further proceedings and a new decision in accordance with this ruling.

SO ORDERED.

Dated at Brattleboro, in the District of Vermont, this 25th day of April, 2017.

/s/ J. Garvan Murtha
Honorable J. Garvan Murtha
United States District Judge